UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:23-CR-267
                            )
         vs.                )
                            )
DEUNTRIA LAMAR LYONS,       )
                            )
            Defendant.      )
_____)


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE
SEPTEMBER 10, 2024


<u>APPEARANCES</u>:

On Behalf of the Government:

    TIMOTHY SIELAFF, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    DANIEL BAKER McINTYRE, III, ESQ.
    Law Office of Daniel Baker McIntyre
    9101 Southern Pine Blvd., Suite 290
    Charlotte, North Carolina 28273


Digitally recorded proceedings transcribed by:

                Cheryl A. Nuccio, RMR-CRR
                 Official Court Reporter
                United States District Court
                 Charlotte, North Carolina

<u>P R O C E E D I N G S</u>

(Transcript of proceedings digitally recorded on September 10, 2024.)

THE COURT:  So the next matter is Deuntria Lamar Lyons.

Am I pronouncing that correctly, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  The number on this is 3:23-cr-267.  Mr. McIntyre is here for him and Mr. Sielaff is here for the government on this.  This is on for consideration of document number 59 which is a Motion for Exemption to Discovery Order.  We also have a government's response to that which is document 60.  I've reviewed all of that, though not this morning so I'll just hope to hear from you guys on this. I don't know if we can figure this out, but I thought it was worth a conversation.

Mr. Sielaff -- or maybe I should go over here to Mr. McIntyre for a minute and hear from him first.  Tell me about the issue you're having and what you're proposing.

MR. McINTYRE:  Well, Your Honor, I'm just -- I'm just trying to figure out the best way for him to assist with his defense.

THE COURT:  Right.

MR. McINTYRE:  He's requested discovery, which I understand why he would request that.

1          THE COURT:  Right.

2          MR. McINTYRE:  The options is he would like to have

3     a physical copy of it.  Unfortunately, discovery in this case

4     is beyond voluminous.  You know, in today's world of social

5     media and everything, it's just changed discovery from when

6     you --

7          THE COURT:  Right.

8          MR. McINTYRE:  -- and I started.

9          So at this point I took it somewhere just to get an

10    idea about how large it would be because I had to provide a

11    hard drive -- I mean a -- yeah, 1 terabyte hard drive to the

12    government to download all the discovery.  I was informed it

13    may be approximately 50,000 pages, if not more, and so I got

14    an estimate that it would be approximately $2,500 for that to

15    be done, which is well beyond our authority on a CJA case.

16    That's just kind of our estimate.  We don't really know how

17    many pages there are.

18          So, you know, I've looked at the standard discovery

19    order, which also, I think, is important regarding this

20    matter; and so I had filed a motion just to ask that the

21    discovery order be suspended in light of the situation.

22          I'm just trying to give him his discovery.  It's

23    massive.  The -- I've been --

24          THE COURT:  I don't want to get too far into the

25    weeds yet.

1          MR. McINTYRE:  But that's what's going on, Your

2  Honor.

3          THE COURT:  Why is it -- why is it so voluminous?

4          MR. McINTYRE:  Maybe the government can respond to

5  that better than I can.

6          THE COURT:  Okay.  Well -- yeah, let me go over here

7  for a minute.

8          Mr. Sielaff, I'm just looking for a solution here.

9  I recognize that we're -- this is nobody's fault, but we're

10  getting into -- we're getting into tough territory here in

11  terms of managing this process a little bit in terms of -- at

12  least this is my personal view, which I'm happy to be talked

13  out of, but these guys have a right to know what the case is

14  against them.

15          MR. SIELAFF:  Yes, sir.

16          THE COURT:  On the other hand, I recognize the

17  government has some righteous concerns about how discovery is

18  handled and, of course, are concerned that it be done in a

19  secure way.  I'm trying to find a sweet spot so that the case

20  can basically continue unabated with everybody having a fair

21  shot at this thing.

22          So look, it's nobody's fault here, but how much --

23  there's too much -- there's a lot of discovery here.

24          MR. SIELAFF:  Yes, sir.

25          THE COURT:  Why is that?

1        MR. SIELAFF:  Your Honor, this is the culmination of

2   an investigation and a string of crimes that were committed

3   over several months and across several jurisdictions.

4        THE COURT:  Several states, yeah.

5        MR. SIELAFF:  And so we have -- I'm going off a

6   rough estimate, but I can see in my mind that I've turned out

7   at least six or seven local municipalities that have their own

8   investigative files, their own reports, their own warrants,

9   their own returns on warrants, their own interviews, and so it

10  simply -- it just builds up over time.  In addition too, there

11  was a Title III wire interception in this case.  That

12  application all by itself is hundreds of pages.  And so all of

13  that does generate a lot of information.

14       As far as providing copies to the defendant and the

15  cost that that involves, the government takes no position.  If

16  Mr. Baker says, hey, I need you to lift the governor on the

17  cost of making copies, I certainly have no objection to that.

18  There are certain things that the discovery identifies as

19  sensitive information that needs to be protected and we only

20  ask that that protection of sensitive information remain in

21  place, but we have no objection to the defendant getting

22  copies if Mr. Baker in his discretion determines that that is

23  appropriate but can't do it because of the cost.

24       THE COURT:  All right.

25       MR. McINTYRE:  And as far as what's sensitive --

1          THE COURT:  Mr. McIntyre -- yeah, go ahead.

2          MR. McINTYRE:  Yeah, I was going to say it would be

3   appreciated if the government could inform me out of -- since

4   there is so much discovery, what is sensitive so that I don't

5   provide it to him because for me to go through 50,000 pages

6   and try to understand what's sensitive and not sensitive is,

7   you know, another monstrous task.

8          THE COURT:  Well, let me go to a different question,

9   and all of these are going to be difficult, I'm afraid.

10          Is he being held in McDowell?

11          MR. McINTYRE:  Yes, Your Honor.

12          THE COURT:  All right.  Talk to me about that for a

13   second.  What's the situation there?

14          MR. McINTYRE:  My understanding is -- I've contacted

15   McDowell.  They do not have computers where I can provide him

16   with a flash drive or anything.

17          My understanding is that some of the facilities in

18   Georgia do have that where if he were down there, I could

19   download things to a flash drive and he could have it on there

20   and he could go through it as he wishes.  But on the other

21   hand, I don't really want him in Georgia because then I have

22   very, very limited access to sitting down and meeting with

23   him.  So I'm not asking that he be transferred down there, but

24   I do know that they have that capability.

25          But McDowell County Jail unfortunately has really no

1  capability.  They have —— I've learned this.  They have one

2  room to meet, for attorneys and clients to meet.  You don't

3  reserve it so I could drive two hours up there, show up,

4  somebody is there.  Oh, we're going to be here all day.  Oh,

5  you can't see your client.  Okay.  Thank you.  Turn around and

6  leave.

7          THE COURT:  So it's like a restaurant with no

8  reservation system.

9          MR. McINTYRE:  It is.  And a good restaurant.

10  Everybody wants to go so it's difficult.  So that's the

11  situation.

12          The other situation is physically sitting down and

13  going through everything with him would take weeks on my part,

14  which I don't think the Court wants to finance me just sitting

15  there for weeks going through it with him, although I

16  certainly can.  If the Court directs me to do it, I'm glad to

17  do it; but I don't think that the Court wants to, you know,

18  provide payment for that.

19          The alternative, I did speak with Larry Dash about

20  this.

21          THE COURT:  What did he say?

22          MR. McINTYRE:  He said maybe you could get a

23  paralegal or somebody to go up there.  I have no idea who I

24  can get to go to McDowell County Jail.  I did speak with

25  someone here in Charlotte who said, yeah, maybe I could do it

1    on weekends, but they'd have to be paid to drive back and
2    forth and sit down with him up there.  I did, you know,
3    contact somebody about that.  That's another alternative.
4             THE COURT:  Yeah.  If you were to -- and I recognize
5    that may not fit here, but if you were to be of a mind to do
6    that, you would apply to the Court, right, for funds to
7    support that?  Is that how that works?
8             MR. McINTYRE:  I guess I would, Your Honor; but then
9    again, you'd have to find -- it's very difficult to find
10   somebody that was willing to go to the McDowell County Jail
11   and sit down.
12            And the other problem, Your Honor, is if I do and
13   they get up there and someone is using the interview room,
14   they don't have a place to meet.  Or they're just going to
15   monopolize the only interview room for weeks and weeks and
16   weeks on end.
17            So that's kind of -- I mean, I'm going to make it
18   happen.  Whatever needs to be done I'm going to make happen,
19   but that's -- so he is -- so that's why I had thought about
20   the possibility of just giving him discovery.  Does that make
21   sense?
22            THE COURT:  Well, I can imagine what Mr. Sielaff is
23   going to say about that suggestion, but I assume the
24   government would be gravely concerned about that, right?
25   That's -- am I remembering correctly that the government's

1  position would be that hard copies of discovery should not be
2  left at detention facilities with defendants?  Am I
3  remembering that right?
4         MR. SIELAFF:  That's not ideal, Your Honor.
5         I do know there is a co-defendant in this case also
6  housed in McDowell County at this point.  A third
7  co-defendant, I'm not sure where he's currently housed.  That
8  is not ideal; but ultimately, you know, the power is with Your
9  Honor, not with what I think is ideal or best practice.
10        Again, I think the standard discovery order makes a
11 good balance to say -- it does give a lot of authority to
12 counsel to use their discretion what is appropriate and not
13 appropriate to share and to provide, but things like addresses
14 and phone numbers should be withheld for obvious reasons.
15        THE COURT:  Well, you raised an interesting issue.
16 Let me follow up on that.
17        There are co-defendants in the case.  Mr. McIntyre,
18 I'm not suggesting any of this is easy.  Quite to the
19 contrary.  But have you talked to any of your colleagues who
20 are representing co-defendants if only to discuss possible
21 joint efforts regarding discovery?  Would that be a
22 possibility?
23        MR. McINTYRE:  I have discussed -- I have discussed
24 it with one of his co-defendants, Mr. -- I think it's
25 Mr. Wade, isn't it?  Yeah, Mr. Wade.

1          THE COURT:  Yeah, I met Mr. Wade.

2          MR. McINTYRE:  Yes.  I did talk -- speak with his

3    attorney about that.  My -- I believe there is some, you

4    know -- she's trying to do things a little bit differently.

5          THE COURT:  Okay.

6          MR. McINTYRE:  Which is probably a good way to do

7    it, but it's very, very limited what she's been able to do.

8          THE COURT:  Well, let me ask a very naive question.

9    I don't want to sound Pollyanna, but look, I get that there

10   are a lot of documents in the case, but that can't be the only

11   case in the world around here that has a lot of documents.  So

12   my question to you, Mr. McIntyre, is what does a good lawyer

13   do?

14         MR. McINTYRE:  And that's -- that's kind of why I'm

15   at a little bit of a loss here, Your Honor.  I just -- I

16   wanted to try to give him discovery so he could go through it.

17   If that's not feasible, then maybe the Court could authorize a

18   paralegal to go sit down with him and go through things and

19   funding for that as a potential means of trying to do

20   something with it.  I'm just trying to figure out a good

21   option to see what the Court thinks is a way to do it because,

22   again, this is a very involved case.

23         I guess the other difficulty too is when folks were

24   here in Mecklenburg, it was much easier, you know, much

25   easier.  You know, the facilities here are so much better.

1   The number of interview rooms -- there are plenty of rooms.
2   It never is full so it's just not an issue.  The problem with
3   where we are now is if it's not McDowell, maybe it's Catawba,
4   it's still the same problem.  Or if not, these folks are down
5   in Georgia which is even a bigger problem.
6               (Counsel and defendant conferred.)
7               MR. McINTYRE:  And he just informed me -- what he
8   just informed me, which I was not aware of, is that he has
9   serious health issues and that he has just been approved to
10  see physicians in the McDowell County area so --
11              THE COURT:  Right.
12              MR. McINTYRE:  -- the last thing he wants is to
13  leave McDowell County right now.
14              THE COURT:  I gotcha, yeah.
15              MR. McINTYRE:  So I just thought I would put that on
16  the record also.
17              So, Your Honor, I'm just trying to figure out a way
18  to do this and what the Court thinks is feasible and what the
19  Court would authorize or allow me to do in this situation.
20  I'm just trying to throw it out there.
21              THE COURT:  Yeah.
22              MR. McINTYRE:  And the other difficulty too, if I
23  could throw it in too, Your Honor.  Again, this kind of all
24  started with -- the reason this has all started is because
25  he's asked for -- he's requesting a copy of his discovery.

1 That's what started all this, if that makes sense, Your Honor.

2         THE COURT: Uh-huh.

3         MR. McINTYRE: Which I understand why he would ask

4 for it. You know, some defendants don't ask for that. They

5 like to just take a look at something here and there. Other

6 defendants are -- some are very hands on. Some are very hands

7 off. He's very hands on. So that's kind of what's created

8 the situation that we're in right now. Nothing wrong with it

9 whatsoever, of course. He's got the right to look at

10 discovery, absolutely, but that's kind of why we're here right

11 now. Trying to figure out the best way to accomplish that.

12         THE COURT: All right. Well, a couple of

13 observations here. I'm a little reluctant to get too far into

14 the weeds because I'm going to, I'm certain, be making some

15 assumptions that are not correct. But 50,000 pages, I mean,

16 that -- it's not like they're going to -- that the McDowell

17 County Sheriff is going to let him wheel 50,000 pages of

18 documents into his cell. That's not going to happen, right?

19         MR. McINTYRE: Correct, Your Honor.

20         THE COURT: Okay.

21         MR. McINTYRE: That's the other difficulty here.

22         THE COURT: All right. And Mr. Sielaff, I was in

23 your -- at your table when life was a lot simpler, right? It

24 was the horse and buggy days of just hard copies so it's hard

25 for me to get my head around what this actually looks like

1    when it's electronic.  I mean, is there a table of contents so
2    a defense attorney can sort of look at that and say, okay,
3    about a tenth of this is really the core of it and I'm going
4    to look at that one-tenth and then flip through the rest?  I
5    mean, how does this work?

6           MR. SIELAFF:  Yes, one could do that.  I'm not going
7    to pretend -- and that's why I think our office does favor an
8    open file policy.

9           THE COURT:  Right.

10          MR. SIELAFF:  It's not really -- it's not really a
11   good idea for me to put myself in Mr. Baker's shoes and be
12   like, well, here's what he needs to look at and he can ignore
13   the rest.  Obviously he's going to look at the case much
14   differently than I.

15          But yes, there are multiple, you know, geolocation
16   returns on multiple different phones.  Some of those are
17   probably relevant to Mr. Lyons and a lot of them probably are
18   not.  There are tower dumps which is, you know, pulling all
19   the phones that connect to a particular tower on a particular
20   day.  The vast majority of that information is of zero use to
21   anybody in this case at this point.  That's when they're
22   trying to identify potential suspects; however, it's part of
23   the investigative file and that gets turned over.

24          And so in a sense, yes.  Does Mr. Baker, does
25   Mr. Lyons have more discovery than they probably need?

1   Absolutely.  But we're not in the practice of trying to decide
2   for them what they want and what they need.
3           THE COURT:  Well, here's one observation I would
4   make; and if people think this is crazy talk, then that's okay
5   with me.  It seems to me the government has some skin in the
6   game here because if Mr. McIntyre and his fellow criminal
7   defense lawyers cannot reasonably get through this material
8   and have an intelligent conversation with their clients, they
9   are less likely to be able to get in a serious conversation
10  with you about a plea deal.
11          MR. SIELAFF:  Yes, sir.
12          THE COURT:  Because -- I'm not suggesting that's
13  what anybody is going to want to do, Mr. McIntyre.  Don't get
14  me wrong.  I'm just making the observation that you have to
15  build a relationship with your client.  You have to articulate
16  to the client what the evidence is against him and then sort
17  of work into a conversation, work your way into a conversation
18  about, okay, here's -- that's the situation so here are the
19  options.
20          Meanwhile, the trial date is out there so it just
21  seems to me that this is bad for everybody, right?  Because
22  it's harder for you to get to the place where you can talk to
23  him about, okay, here's the plea offer.  Here's what's --
24  here's the basis of the plea offer.  You can do that or we can
25  go to trial.

1        But if discovery is so messy that you can't get your
2   arms around it, then how do you have that conversation?  Is
3   that crazy?
4        MR. McINTYRE:  No, it's actually correct.
5        THE COURT:  All right.  How many defendants are in
6   this case?  Is this -- forgive me, is this the alleged jewelry
7   store thing?
8        MR. SIELAFF:  Yes, sir.
9        THE COURT:  All across --
10       MR. SIELAFF:  In this district there are --
11       THE COURT:  -- the Southeast.
12       MR. SIELAFF:  -- only three charged, but yes, sir.
13       THE COURT:  Yeah.  All right.  Well, I'll think
14   about this.  It occurs to me, Mr. McIntyre, I mean, this may
15   be -- this may be to you an impractical suggestion, but it
16   used to be that we would get -- I can't remember what the
17   statute is, 3006E or something, where a defense attorney who's
18   appointed can request money to support either a paralegal or
19   an expert of some sort.
20       MR. McINTYRE:  I don't know the number, but I know
21   what you're talking about.
22            (Counsel and defendant conferred.)
23       MR. McINTYRE:  He's telling me it's 3006A.
24       THE COURT:  Thank you, counselor.
25       MR. McINTYRE:  Hands on.

1          THE COURT:  Yeah, thank you for your correction.

2   You're right, it is 3006A.

3          Well, Mr. McIntyre, I wonder whether you might

4   consider asking for court -- or government money to support a

5   paralegal or some other -- some other resource to help with

6   the process.

7          Now, I get the devil is in the details here, right?

8   Getting somebody to go to McDowell where there is only one

9   room, I don't know how that works exactly, but -- you don't

10  look like that's a very good idea.

11         MR. McINTYRE:  It may be the only idea.  It may be

12  the only place.

13         THE COURT:  Well, somebody's got to review this

14  stuff.

15         MR. McINTYRE:  Right, and that may be the best way

16  to do it.  It may be the best way to do it is to not

17  physically give him the discovery and use a paralegal to go

18  sit down and go over it with him.  That may be the best way to

19  do it.  I'm just trying to throw the options out to the Court

20  to see what the Court thinks is best and best suits this

21  defendant.

22         THE COURT:  Well, I ask again is the -- are the

23  co-defendants' lawyers not wringing their hands over the same

24  thing?  I'm not saying you're the outlier, but what's going

25  on?

1          MR. McINTYRE:  No, there's only -- there's only

2     one -- I mean, my understanding is that the federal defender's

3     office is just now getting involved with co-defendant number

4     3.  He has just been brought into the case.

5          THE COURT:  Okay.

6          MR. McINTYRE:  So I have had -- I have had many

7     conversations with Ms. Richmond who is the attorney for

8     Mr. Wade and, yes, it is -- the discovery in this matter is

9     causing heartache for both of us.

10         THE COURT:  Okay.

11         MR. McINTYRE:  I've had many conversations with her

12    about it.

13         THE COURT:  Do you know -- I'm going to stop here in

14    a second, I promise.  Do you know who the assistant federal

15    defender is who's going to be in the case?

16         MR. SIELAFF:  I believe it's Ms. Cause, but it's a

17    best guess.

18         THE COURT:  She looks a little surprised by that.

19         MR. SIELAFF:  (Inaudible.)

20         MS. CAUSE:  Good afternoon, Your Honor.

21         THE COURT:  Hey.

22         MR. SIELAFF:  (Inaudible.)

23         She says no.  Ms. Sullivan.

24         THE COURT:  It's Ms. Sullivan.  Well, I wonder if

25    you could have a conversation with Ms. Sullivan about -- I'm

1   just thinking.  These may be crazy ideas.  I wonder if it

2   might be a good idea to talk to Ms. Sullivan about what the

3   federal defender's office is going to do about the discovery

4   issue.  I think we've probably done as much on this today as

5   we're going to be able to do, but it strikes me that some

6   cooperative efforts involving all defense counsel in the case

7   is a possibility.  It strikes me that seeking assets to pay

8   for help, like a paralegal might be an option under 3006A,

9   might be a possibility.  And these are not mutually exclusive.

10   They could all be done at the same time or together in

11   coordination.

12         But I guess the thing I would want the government to

13   think about a little is if this doesn't get resolved in some

14   fashion, it's going to be bad for everybody, including the

15   government which may end up at a trial it doesn't want because

16   the defendants couldn't ever get comfortable with what the

17   evidence was against them to make a choice to plead out.

18         And I make no judgment about the virtues of any of

19   those strategies.  If they want a trial, then good for them.

20   But I care about this stuff a lot.  I want everybody to get a

21   fair opportunity to get their case ready and make the choices

22   that they want to make based on a high percentage of what's

23   available out there to know, if that's clear enough.

24         MR. SIELAFF:  Yes, sir.  I will -- I'll tell the

25   Court the application for the affidavit in support of the

application for the Title III intercept, in my opinion, is a
very detailed, organized summary of the entire investigation
leading up to the interceptions themselves.

THE COURT:  Yeah.

MR. SIELAFF:  That has been provided.

I would also offer to Mr. Baker and his client,
obviously it's one-sided, but I'd be happy to sit down with
the two of them and an agent and walk them through what I
think the important evidence is in the case.  Obviously,
though, my view of the case might be vastly different from
theirs, but I'm more than happy to do that.

THE COURT:  Well, that's kind of you to say.  I
think we all understand the spirit in which that is offered.
Some kind of reverse proffer might be helpful.

But look, I'm going to have to leave this with you
guys for now, but I -- Mr. McIntyre, I really do wonder
whether a paralegal to go through some of this stuff and
separate the wheat from the chaff might be worth looking at.
Or talk to the federal defender's office about what asset
they're going to use.  They're no smarter than you, don't get
me wrong.  I'm just saying they're used to thinking about
national assets that they can draw upon, vendors who do stuff.
Maybe not in this case, I don't know.  Maybe I'm being naive.

Look, I just want everybody to get a fair shot at
figuring it out so that whatever choices are made by the

1  people involved are based on the facts.

2          MR. McINTYRE:  One thing I would add is, again, I

3  am -- I do like to communicate with co-defendants' counsel on

4  these matters.  At the same time, I don't --

5          THE COURT:  That can be tricky.

6          MR. McINTYRE:  That can be tricky.

7          THE COURT:  Yes.

8          MR. McINTYRE:  And I don't really feel comfortable

9  with us all cooperating as far as discovery matters because

10  every defendant has different motivations --

11          THE COURT:  Okay.

12          MR. McINTYRE:  -- and different intentions.

13          THE COURT:  Well, that's a fair point.

14          MR. McINTYRE:  And so we have to -- I have to kind

15  of keep that in mind.

16          THE COURT:  All right.  Well, I'm not sure I -- I

17  think I may have accomplished exactly nothing, but maybe it

18  gets us all thinking about what might be possible here.  I'll

19  take the motion under advisement.

20          I'm assuming, Mr. Sielaff, that you're opposed to

21  the relief sought, right?

22          MR. SIELAFF:  As far as it refers to lifting the

23  monetary restriction on the amount Mr. Baker can spend on

24  copies, I take no position on that at all.  If the Court wants

25  to lift that governor, great.  If he wants to be able to spend

1  more money and the Court is willing to allow him to spend more

2  money to make copies, that's fine by me.

3        THE COURT:  Okay.  All right.  Well, it may not be

4  immediately apparent, but I feel like this was a good

5  discussion to have.  We're at least -- we're starting, right?

6        When is the trial date, or do we even have one?

7        MR. SIELAFF:  I believe we're in November now.

8        THE COURT:  Do we have a defendant who's just

9  joined, so to speak?

10        MR. McINTYRE:  Yes, Your Honor, so I...

11        THE COURT:  Okay.  Mr. Lyons, I don't want you to go

12  out of here thinking, well, man, these people don't know what

13  they're doing.  We're really thinking this through.  I

14  understand the issue.  I need to give it some thought.  I

15  think your lawyer, frankly, needs to give it some thought, and

16  I know he will because he's very good at what he does.  So

17  we'll see what we can do for you, okay?

18        All right.  Thanks everybody.  Appreciate it.

19        MR. SIELAFF:  Thank you, Your Honor.

20        MR. McINTYRE:  Thank you, Your Honor.

21        THE COURT:  I'll take it under advisement.

22        Have a safe trip back, Mr. McIntyre.  Thank you.

23        MR. McINTYRE:  Thank you so much.

24        THE COURT:  Good luck.

25        (End of proceedings.)

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6      I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 digitally-recorded proceedings, transcribed to the best of my

12 ability, held in the above-entitled matter and that the

13 transcript page format is in conformance with the regulations

14 of the Judicial Conference of the United States.

15

16     Dated this 17th day of January 2025.

17

18               s/Cheryl A. Nuccio

19               _____
                 Cheryl A. Nuccio, RMR-CRR
20               Official Court Reporter

21

22

23

24

25